FIRST STATE BANK OF BRYSON,
Appellant,

v.

G. W. (Bill) JOHNSON, Appellee.

No. 18096.

Court of Civil Appeals of Texas,
Fort Worth.

Aug. 2, 1979.

Rehearing Denied Sept. 13, 1979.

Vial, Hamilton, Koch, Tubb, Knox & Stradley and James A. Knox and James L. Deem, Dallas, for appellant.

Simon & Simon and Sheldon Anisman, Fort Worth, for appellee.

## OPINION

HUGHES, Justice.

First State Bank of Bryson has appealed a judgment based on a jury verdict rendered by the trial court in favor of the defendant, G. W. Johnson, in Bank's suit on a note.

We affirm.

The statement of facts reveals that on October 14, 1975 Johnson executed and delivered a note for $60,000.00 to Bank, payable to Bank "On demand, or if no demand is made then on or before 2–11–76 (120 days)". The back of the note reflects a principal payment dated "10–28–75" in the amount of "$37,000.00" with a balance of "$23,000.00" and a notation "sold to Bank of Crowley, Crowley, Tex."

Such note was executed by Johnson to renew a note dated March 3, 1975 which was in renewal of a note executed and delivered by Johnson on or about August 28, 1974. All such notes were shown on Bank's records as assets. The 1974 and March 1975 notes were in the sum of $70,000.00. Defendant paid $10,000.00 at the time of the execution of the October 1975 note.

Between August 28 and November 4, 1974, Chuck Curtis owned 60% of Bank's stock, was president, director, chairman of the board and chief executive officer of bank. He was also a depositor, customer and borrower. Also, Curtis owned one-third of the controlling interest in the First State Bank of Crowley. Curtis had been in the cattle and horse business since 1959. While president of Bank he transacted his personal business on the banking premises.

Curtis's personal checking account was overdrawn in the amount of $8,408.00 on August 29, 1974. He transacted several cattle sales around August 30, 1974, putting money in such account. He transferred to Johnson his interest in 225 head of cross-bred cows with calves located on J. D. Bloodworth and Don Coleman places in Archer County. Bank loaned purchase money ($70,000) to Johnson for such purchase and took the August 28, 1974 note in return, with such cattle as collateral.

Curtis got the proceeds of the loan as seller, with the cattle kept on leases owned by him—facts known to Johnson. Johnson said Curtis told him the cross-breeds would be sold in his forthcoming Maine-Anjou cattle sale to pay off the note. Also, Curtis called an insurance man (in Johnson's presence) and told him to put Johnson as beneficiary on a $100,000.00 life insurance policy. Johnson, in addition to the note, executed a security agreement and a financing statement. He said he entered the transaction because he and Curtis were friends and he had confidence in him.

The bank examiners arrived around September 4, 1974. Curtis said he feared the loan would draw criticism from them and hurt Johnson's borrowing ability in the future. To forestall such a criticism, Curtis transferred $70,000.00 of such loan proceeds to Terrell Taylor, his brother-in-law, who deposited them in his account in the First State Bank of Olney. Thence Taylor transferred the same to Johnson's account in the Jacksboro National Bank. Curtis drew a draft on the Jacksboro account in the name of First State Bank of Bryson for $70,000.00 on the face of which was written "note payment in full".

Johnson learned about the $70,000.00 in the Jacksboro account (and the draft) when the Jacksboro bank asked for his approval of the draft (which he approved). The $70,000.00 was transferred to an existing Jacksboro National account in the name of Bank, which Curtis said would be a means to cover the August 28 note in case the examiners criticized the loan. No "criticism" occurred, although the examiners did say the collateral should be inspected.

After the examiners left, Curtis deposited the $70,000.00 in his personal account in Bank. In other words, the money was taken (as cash) from Bank's account at Jacksboro and deposited in Curtis's account in Bank. On November 4, 1974 Curtis sold his stock in Bank to Bill Freeman, who became president. In February 1975 Johnson took Freeman to see the collateral cattle. Johnson renewed the first note by the second note on March 3, 1975 for the same amount, $70,000.00. The second note was due September 3, 1975. Curtis paid the interest on the first note.

Johnson and Freeman moved what they thought were the cross-bred cattle from the Bloodworth place to another Curtis lease. This was due to rumors that City National Bank in Wichita Falls was going to pick them up under a lien it held on the cross-breeds by reason of a personal loan to Curtis. At Freeman's request, Johnson paid $10,000.00 on the second note and gave a $4,375.00 note for accrued interest thereon. Johnson sold some of the moved cattle to pay the $10,000.00. At this time the third and last note (here sued upon) was executed in the reduced sum of $60,000.00.

Later, in January, 1976, Johnson said he learned that the true collateral cattle had been picked up by the City National Bank. He notified Freeman. He did not pay anything further on the note and when it became due on February 11, 1976 and Bank filed this suit against him for payment of such note.

The jury found:

1. The August 28, 1974 note was for the purpose of accommodating Curtis;
2. Bank misapplied the funds of the September 4, 1974 draft;
3. Such misapplication injured Johnson;
4. The renewal note executed by Johnson on October 14, 1975 was not a waiver of such misapplication.

In his cross point number 3, Johnson claims trial court erred in not submitting his requested issue number 1 inquiring whether Johnson's execution of the August 28, 1974 note was not for the purpose of accommodating Bank.

In his cross point number 4, Johnson claims trial court erred in not submitting his requested special issue number 6 inquiring whether or not Curtis was the alter ego of Bank.

■ We overrule Bank's point of error number 1 wherein it avers that no special issue or combination of issues in the charge established a Johnson defense against liability on the sued upon note. The draft, pled and proved by Johnson, was sufficient prima facie proof of payment of such note, leaving the burden on Bank to refute the effect of such paid draft which had the express notation "note payment in full". Bank did not even request an issue to establish an avoidance of the effect of such paid draft. That draft was in the handwriting of Curtis, then president of Bank, and was admittedly paid by Jacksboro National Bank to Bank in the amount of the only Johnson note held by Bank. We hold this to amount to a release of Johnson on the note. "A receipt signed by a creditor, or a document tending to show payment such as a release, constitutes prima facie proof of payment, however; the burden of proving otherwise devolves on him who denies its validity." 44 Tex.Jur.2d *Payment* § 64 (1963).

■ Uncontradicted, a receipt establishes facts therein stated as a matter of law. *Alexander v. Meredith*, 262 S.W. 111 (Tex. Civ.App.—Austin 1924, writ ref'd). A note introduced by a plaintiff in a suit thereon makes a prima facie case. A release for such note then being introduced makes a prima facie rebuttal. Plaintiff had the burden to go forward with rebuttal of such release. *Martin v. Farmers' Nat. Bank*, 294 S.W. 240 (Tex.Civ.App.—Waco 1927, no writ).

■ In this case, Bank did not plead any avoidance except that Johnson waived the effect of the draft recitation by executing a renewal note. The jury answered in special issue number 4 that such execution was not a waiver of misapplication of the draft funds.

Tex.Bus. & Comm.Code Ann. § 3.802 (1968) recites:

"(a) Unless otherwise agreed where an instrument is taken for an underlying obligation

"(1) the obligation is pro tanto discharged if a bank is drawer, maker or *acceptor* of the instrument and there is no recourse on the instrument against the underlying obligor; . . ." (Emphasis ours.)

■■ We overrule point of error number 2 which was to the effect that the testimony of Johnson's business transactions with Curtis was hearsay to Bank. We hold it to be elemental that testimony relating to the transactions which resulted in Bank's sued upon note was not hearsay when it involved, as here, the president of Bank. Declarations of an agent shown to affect his principal in a business transaction of the principal usually may be shown. *Hinson v. Walker & Co.*, 65 Tex. 103 (1885).

■ The uncontroverted proof here established that Bank accepted the draft inscribed "note payment in full". The jury answered special issues numbers 2 and 3 that the funds therefrom were misapplied by Bank to the in jury of Johnson. We hold that sufficient evidence sustains such answers in that it is uncontroverted that Bank's president, Curtis, put the funds in his own account after Bank had accepted the draft for its stated purpose. We overrule points of error numbers 3, 4 and 5.

In the event we err in any ruling heretofore made we take occasion to note that we have examined all of Johnson's cross-points and conclude they should all be overruled. In the matter of cross-point number 1 involving the counter-claim for payment of the $4,375.00 note given for interest, we note that Johnson failed to introduce evidence he had paid same. Trial court also ruled such note not in issue in this case.

We affirm.